STEDWELL JOHNSTON and ELAYNE G. JOHNSTON, et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Johnston v. Commissioner
Docket Nos. 678-75, 684-75, 685-75, 686-75, 687-75, 688-75.
United States Tax Court
T.C. Memo 1976-142; 1976 Tax Ct. Memo LEXIS 259; 35 T.C.M. (CCH) 642; T.C.M. (RIA) 760142; May 6, 1976, Filed Edward W. Turley, Jr., for the petitioners. Norman N. Pickett, for the respondent. FEATHERSTON
*260 MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes for 1971, the amounts assessed for 1972 in docket Nos. 685-75 and 688-75 not being in dispute: Docket No.
Amount
678-75
$ 3,485.65
684-75
11,400.38
685-75
3,225.02
686-75
12,068.76
687-75
21,600.13
688-74
4,568.09
Other issues having been settled by the parties, the only issue for decision is whether petitioners may properly deduct for 1971 their respective shares of the net operating loss of an electing small business corporation. The decision of that issue turns on whether an electing small business corporation, Stonehenge Company, during its fiscal year ended June 30, 1971, received sufficient "passive investment income," within the meaning of section 1372(e)(5), [2] to cause a termination of its small business corporation election. FINDINGS OF FACT All the petitioners in these consolidated proceedings were legal residents of Texas at the time their petitions were filed. *261 The petitioners in each docket filed a joint Federal income tax return for 1971. Stonehenge Company (hereinafter Stonehenge) was incorporated on April 7, 1965, under the laws of Texas. During 1971 petitioners were shareholders of Stonehenge and were partners in Southwestern Investment Properties (hereinafter Southwestern), a partnership organized on February 20, 1969. On the date of its organization, Southwestern acquired an 18.103-acre tract of land in Houston, Texas. A decision was made to construct on a portion of this land an apartment complex to be known as Hammerly Bordeau. To finance this project, Stonehenge obtained a commitment of long-term financing from First Mortgage Company of Texas, Inc., on May 19, 1970. On June 29, 1970, Southwestern conveyed to Stonehenge about 7 acres of the 18.103-acre tract for use as a site for the apartment complex, and the complex was built. On July 21, 1970, Stonehenge made an election under section 1372(a) to be treated as a "small business corporation" for income tax purposes. Pursuant to that election, Stonehenge filed a Form 1120S, U.S. Small Business Corporation Income Tax Return, for the fiscal year ended June 30, 1971. *262 Stonehenge also filed a Form 1120, U.S. Corporation Income Tax Return, for the period July 1, 1971, through December 31, 1971. In both of these returns, Stonehenge reported its income and deductions under the cash receipts and disbursements method of accounting. In an effort to avoid having its small business election terminated by the passive investment income provisions of section 1372(e)(5), Stonehenge entered into an arrangement with Tex-Ex Corporation (hereinafter Tex-Ex), under which rental income from the apartment complex was assigned to Tex-Ex, an organization engaged in fund-raising activities for the Texas University Ex-Students' Association. Tex-Ex had been issued a determination letter qualifying it as a taxexempt organization under section 501(c)(3). The assignment agreement is as follows: ASSIGNMENT OF RENTS FROM STONEHENGE CORPORATION TO TEX-EX CORPORATION Stonehenge Corporation, the owner of an apartment complex in Houston, Texas, near Shadowdale and Hammerly Boulevard, the apartment complex being known as Hammerly Bordeau, in consideration of the receipt of ten dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which are hereby *263 acknowledged, sells, transfers, and assigns to Tex-Ex Corporation the right to receive the first ninety thousand dollars ($90,000.00) of rents paid by the tenants of Stonehenge. Tex-Ex Corporation agrees to pay to Stonehenge Corporation two thousand dollars ($2,000.00) on March 1, 1971, if and only if Tex-Ex Corporation has received two thousand dollars ($2,000.00) from the tenants of Stonehenge prior to March 1, 1971. In addition, Tex-Ex Corporation agrees to pay to Stonehenge Corporation eighty-eight thousand dollars ($88,000.00) within fourteen days after Tex-Ex Corporation has received from the tenants of Stonehenge ninety thousand dollars ($90,000.00), if and only if Tex-Ex Corporation receives ninety thousand dollars ($90,000.00) from the tanants [sic] of Stonehenge, but in no event shall the second payment of eighty-eight thousand dollars ($88,000.00) be made from Tex-Ex Corporation to Stonehenge Corporation prior to July 6, 1971. If Tex-Ex Corporation does not receive ninety thousand dollars ($90,000.00) from the tenants of Stonehenge prior to December 1, 1971, then the total of the amount received by Tex-Ex Corporation from the tenants of Stonehenge as of December 1, 1971, less *264 two thousand dollars ($2,000.00) shall be paid to Stonehenge Corporation within fourteen days after December 1, 1971. On or about January 5, 1971, a savings account for the deposit of the assigned rents was opened in the name of Tex-Ex at the Bank of Harris County. On January 21, 1971, the first rents were collected by Stonehenge from the Hammerly Bordeau apartment tenants. By June 30, 1971, rents of $27,913.60 had been collected and deposited in the Tex-Ex account, that sum consisting of the following: Rents from tenants
$ 27,770.97
Commissions from washing machines
142.63
Total
$ 27,913.60
Stonehenge elected to report its receipts under the assignment transaction with Tex-Ex under the installment method of reporting allowed by section 453, and its return for its taxable year ended June 30, 1971, showed income of $2,000, the amount Tex-Ex agreed to pay Stonehenge during that fiscal year under the assignment-of-rents agreement. The $2,000 so reported was never in fact paid by Tex-Ex to Stonehenge during the fiscal year ended June 30, 1971. Between March 3, 1971, and August 25, 1971, deposits in the Tex-Ex account totaled $90,349.96, consisting of the following *265 items: Rents from tenants
$ 69,034.33
Commissions from washing machines
in apartment complex
405.63
Transfer from checking account
of Hammerly Bordeau at the
Bank of Harris County,
Account No. 000-778
9,650.00
Check from Boley Construction Co.
11,260.00
Total
$ 90,349.96
The $11,260 deposit did not represent rental proceeds. That sum was borrowed from Boley Construction Company by Stonehenge or Stephen and Robert Ley and deposited in the Tex-Ex account in order to bring the deposits in that account to the amount of $90,000. On October 13, 1971, the Tex-Ex savings account was closed by the issuance of checks to Stonehenge for $90,353.85 and to Tex-Ex Corporation for $810.77. The $810.77 was interest earned on that account. For purposes of its cash receipts and disbursements statement, Tex-Ex treated the transaction with Stonehenge as a loan of $90,353.85 to Tex-Ex, interest of $810.77 earned by Tex-Ex, and a loan repayment of $90,353.85. At all relevant times herein, Stonehenge retained ownership of the apartment complex and paid all its operating expenses. The "Assignment of Rents" to Tex-Ex Corporation did not result in any change in Stonehenge's *266 dominion and control over the property. Tex-Ex attempted to exercise no rights over the management of the property. On September 30, 1971, Stonehenge executed a note for $1,900,000, payable to First Mortgage Company of Texas, Inc. When the loan was funded on October 19, 1971, most of the loan proceeds were paid to First City National Bank of Houston, the interim financer. On December 20, 1971, Stonehenge conveyed Hammerly Bordeau to its shareholders, the petitioners herein. On December 27, 1971, Stonehenge was dissolved, and the shareholders then conveyed their interests in Hammerly Bordeau to Southwestern Investment Properties. For Stonehenge's fiscal year ended June 30, 1971, the company claimed a net loss of $196,074.06 from business operations. On their individual tax returns for the calendar year 1971, petitioners, as shareholders of Stonehenge, deducted their pro rata shares of their loss pursuant to section 1374. [3]
*267 OPINION Respondent made the following determination in each of these cases: The Stonehenge Company, a Subchapter "S" corporation in which you were a shareholder, entered into an agreement with Tex-Ex Corporation which purported to assign the first $90,000.00 of rent income of Stonehenge to Tex-Ex Corporation. The transaction was reported by Stonehenge on the installment method. While the form of the transaction with Tex-Ex Corporation was that of a sale, the substance was, in fact and in law, that of an interest-free loan to Tex-Ex from rent income of Stonehenge. Inasmuch as the transaction is not in substance a true sale and assignment, Stonehenge received rents (passive investment income) in excess of $3,000.00 and in excess of 20 percent of its gross receipts and, therefore, pursuant to the provisions of Code section 1372(e)(5), Stonehenge Company's Subchapter "S" election is terminated. Further, the transaction cannot be properly reported [on an installment basis] pursuant to Code section 453(b)(1)(B). You are, therefore, precluded from claiming the distributive loss * * * [in the amount] claimed on your 1971 tax return. Accordingly, your income is increased *268 by this amount. * * *
We hold for respondent. Section 1372(e)(5) [4] provides that a corporation's election pursuant to section 1372(a) to be treated as a small business corporation shall terminate if, for any taxable year for which the election is in effect, such corporation has gross receipts of which more than 20 percent is "passive investment income." The term "passive investment income" is defined by section 1372(e)(5)(C) to include gross receipts derived from rents. The rental receipts of $27,913.60 from the Hammerly Bordeau apartments for the taxable year ended June 30, 1971, if includable in Stonehenge's taxable receipts for that period, were sufficient to cause a termination of Stonehenge's section 1372(a) election. Thus, the issue to be decided is whether Stonehenge avoided the receipt of the Hammerly Bordeau rental income during its taxable year ended June 30, 1971, by assigning such income to Tex-Ex on the understanding that Tex-Ex would return the same amount during Stonehenge's following taxable year. *269 Petitioners argue that Stonehenge's contract rights to receive the Hammerly Bordeau rents were property interests and that Stonehenge sold those contract rights to Tex-Ex and elected to report the sales proceeds under the installment method allowed by section 453. In this manner, petitioners argue, Stonehenge effectively avoided the receipt of taxable rental income during its taxable year ended June 30, 1971. We do not agree. The source of the assigned rental income was the Hammerly Bordeau apartments, and the Tex-Ex assignment-of-rents agreement did not dilute in any way Stonehenge's ownership, dominion and control, or management rights and responsibilities in respect of those apartments. Stonehenge made merely an anticipatory assignment of those rents to Tex-Ex, and Tex-Ex agreed to return the same amount after the close of Stonehenge's taxable year ended June 30, 1971. Indeed, Tex-Ex established a savings account in the Bank of Harris County as a special repository of the assigned rents, where they remained until they were returned to Stonehenge. Tex-Ex retained only the interest earned on the funds while on deposit. The fundamental principle of annual tax accounting *270 cannot be so easily circumvented. While the form of the assignment agreement may have been a sale of future rents, that was not its substance. Stonehenge merely loaned or agreed to deposit the Hammerly Bordeau rents in escrow until after the close of its taxable year ended June 30, 1971. It is irrelevant that the assignee, Tex-Ex, was an independent third party rather than an individual or corporation related in some way to Stonehenge. The following reasoning of this Court in , affd. per curiam , where an owner attempted to "sell, transfer and assign" future rents from an apartment complex and thereby accelerate the receipt of taxable income, is apposite: A close look at the transaction reveals that the partnership retained, at all times, the ownership of the apartment building and "assigned" only a specified dollar amount of future rents plus a specified interest on that amount. The "assignment" did not result in any substantial change in the partnership's dominion and control over the property and no indicia of ownership in the apartment building were given to the Vannie *271 Cook Trusts [the assignees]. In fact, Castle Gardens, Ltd. [the apartment building owner and assignor], continued to lease the apartment building and collect the rents. Thus, when he caused the "Assignment of Rents" agreement to be executed, J. A. Martin [the general partner] merely exercised, in advance, his power to dispose of the income from the apartment building. In other words, the partnership kept the "tree" but claims to have assigned part of the ["fruit."] Under these circumstances, where there has been no effective separation of the "fruit" from the "tree," the law clearly taxes income when and as received. Income from property is taxable to the owner of such property, and a mere assignment of the right to receive such income is not enough to relieve the assignor of the tax. ; , affd. (C.A. 7, 1954), certiorari denied ; and (C.A. 7, 1969). The case of , *272 revg. and remg. a Memorandum Opinion of this Court, cited by petitioners, is distinguishable on its facts. [5]
To reflect the disposition of the settled issues, Decisions will be entered under Rule 155. Footnotes
1. The following cases are consolidated herewith: Robert M. Ley and Margaret H. Ley, docket No. 684-75; Eugene B. Smith and Ann G. Smith, docket No. 685-75; Stephen W. Ley and Sharon G. Ley, docket No. 686-75; Wayne T. Roberts and Virginia Roberts, docket No. 687-75; and Stephen T. Cochran and Betty W. Cochran, docket No. 688-75.↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue.↩
3. SEC. 1374. CORPORATION NET OPERATING LOSS ALLOWED TO SHAREHOLDERS. (a) General Rule.--A net operating loss of an electing small business corporation for any taxable year shall be allowed as a deduction from gross income of the shareholders of such corporation in the manner and to the extent set forth in this section. (b) Allowance of Deduction.--Each person who is a shareholder of an electing small business corporation at any time during a taxable year of the corporation in which it has a net operating loss shall be allowed as a deduction from gross income, for his taxable year in which or with which the taxable year of the corporation ends (or for the final taxable year of a shareholder who dies before the end of the corporation's taxable year), an amount equal to his portion of the corporation's net operating loss (as determined under subsection (c)). * * *↩
4. SEC. 1372. ELECTION BY SMALL BUSINESS CORPORATION. (e) Termination.-- * * *
(5) Passive investment income.-- (A) Except as provided in subparagraph (B), an election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is passive investment income. Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation. (B) Subparagraph (A) shall not apply with respect to a taxable year in which a small business corporation has gross receipts more than 20 percent of which is passive investment income, if-- (i) such taxable year is the first taxable year in which the corporation commenced the active conduct of any trade or business or the next succeeding taxable year; and (ii) the amount of passive investment income for such taxable year is less than $ 3,000. * * *↩
5. Because we base our holding on the foregoing grounds, it is unnecessary for us to consider the propriety of Stonehenge's use of the installment method in reporting the income from the purported assignment of rents.↩